IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| REINALDO CHERBONY ROSADO, :<br><br>Plaintiff, :<br><br>v. :<br><br>NANCY A. BERRYHILL, :<br>Acting Commissioner, :<br>Social Security Administration, :<br><br>Defendant. : | Action No. 4:16-cv-00173 |

## REPORT AND RECOMMENDATION

Plaintiff Reinaldo Cherbony Rosado ("Plaintiff") filed a complaint, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), that seeks judicial review of the final decision of the Defendant, Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration ("the Commissioner"), which denied Plaintiff's claim for Disability Insurance Benefits ("DIB") pursuant to Title II, and his claim for Supplemental Social Security Income ("SSI") pursuant to Title XVI, of the Social Security Act. Both parties have filed Motions for Summary Judgment, ECF Nos. 16 and 20, with briefs in support, ECF Nos. 17 and 21, which are now ready for recommended resolution.

This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Local Civil Rule 72, and the April 2, 2002 Standing Order on Assignment of Certain Matters to

United States Magistrate Judges. For the following reasons, the undersigned **RECOMMENDS** the Commissioner's Motion for Summary Judgment, ECF No. 20, be **DENIED**, Plaintiff's Motion for Summary Judgment, ECF No. 16, be **GRANTED** to the extent it seeks reversal and remand of the Commissioner's decision, and **DENIED** to the extent that it seeks entry of an order directing the award of benefits, and the Commissioner's decision be **VACATED** and **REMANDED**.

## I. PROCEDURAL BACKGROUND

Plaintiff filed an application for a period of disability and disability insurance benefits on February 18, 2015, alleging that he became disabled on May 3, 2014 due to diverticulitis[1], post-traumatic stress disorder ("PTSD"), degenerative disc disease ("DDD") of the cervical and lumbar spine, and muscle spasms. R. at 13, 105-06, 219-33, 268.[2] Plaintiff's application was initially denied on May 28, 2015, R. at 132-42, and denied again upon reconsideration on June 23, 2015, R. at 144-50. Plaintiff requested a hearing in front of an Administrative Law Judge, which was held on October 28, 2015 before Administrative Law Judge Tom Duann ("the ALJ"). R. at 13, 71-104. A supplemental hearing was held on March 21, 2016. R. at 37-70. The ALJ issued his decision on May 17, 2016, denying Plaintiff's application. R. at 10-36. On September 20, 2016, the Appeals Council for the Office of Disability and Adjudication ("Appeals Council") denied Plaintiff's request for review of the ALJ's decision. R. at 1-3. After exhausting his administrative remedies, Plaintiff filed his Complaint for judicial review of the Commissioner's

---

[1] Plaintiff reported to his Primary Care Provider that he acquired diverticulitis in 2005 while in Pakistan and "still has liquid stools since that time." R. at 405.
[2] "R." refers to the certified administrative record that was filed under seal on February 27, 2017, ECF No. 9, pursuant to Local Civil Rules 5(B) and 7(C)(1).

final decision on December 14, 2016.[3] ECF No. 1. The Commissioner filed an Answer on February 27, 2017. ECF No. 8. Both parties filed Motions for Summary Judgment, ECF Nos. 16 and 20, and Plaintiff filed a Reply in support of his Motion, ECF No. 22, and the matter is now ripe for recommended adjudication.

## II. RELEVANT FACTUAL BACKGROUND

In his application, filed February 18, 2015, Plaintiff alleges disability due to diverticulitis, post-traumatic stress disorder ("PTSD"), degenerative disc disease of the lumbosacral and cervical spine, muscle spasms, insomnia, major depressive disorder, paralysis of sciatic nerve, sleep apnea, degenerative arthritis of the spine, and second degree burns, with a disability onset date of May 3, 2014. R. at 13, 283.[4] At the time of the ALJ's May 17, 2016 decision, Plaintiff was an English-speaking, forty seven year old man with a high school education who served in the United States Army from October 16, 1990 until his retirement and Honorable Discharge on January 31, 2011. R. at 75, 77, 227, 412, 421.[5] At the first hearing held on October 28 2015, Plaintiff appeared, was represented by an attorney, Beverly Taylor, and supplemented his medical records by providing additional information via testimony. An impartial Vocational Expert ("VE"), Robert Edwards ("Mr. Edwards") also testified. R. at 71-104. On November 13, 2015, Plaintiff filed written objections to the testimony of Mr. Edwards, R. at 342-67, after indicating the intention to lodge such objections at the beginning of the October 28, 2015

---

[3] At the time this Complaint was filed, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration ("SSA"). Nancy A. Berryhill is now the current Acting Commissioner.

[4] In Section 11 of Plaintiff's completed SSA Adult Disability Report Form, in response to a prompt to provide any additional information, Plaintiff states "I am in constant pain and have limited mobility. I am only able to sleep for three hours every two or three days. I struggle to stay focused and concentrate on tasks at hand. I experience attacks on [sic]." R. at 289 (Exhibit 3E).

[5] At the October 28, 2015 hearing, the ALJ apparently "corrected" Plaintiff's testimony from 1990 to 1997 as the starting year of Plaintiff's Army career, R. at 77, yet the dates of service provided by Plaintiff are October 17, 1990 through January 31, 2011, R. at 227, 290.

3

hearing, R. at 94.  At the supplemental hearing[6] on March 21, 2016, Plaintiff was represented by

Jacqueline Hartley,[7] an attorney employed by Citizens Disability, LLC.  R. at 37-70.  Plaintiff

was present but did not testify at the supplemental hearing, however Paula Santagati[8], an

employee of Citizens Disability, LLC, did appear telephonically to provide vocational expert

testimony in support of Plaintiff's claim.  R. at 37-49.  Mr. Edwards also appeared and provided

supplemental testimony.  R. at 50-70.   The record included the following factual background for

the ALJ to review:

Plaintiff resides in Newport News, Virginia with his wife, Samantha Cherbony and one

of his four children.  R. at 107, 228, 414, 421.  He is a high school graduate and has completed at

least two years of college.  R. at 421.  During his career in the United States Army, Plaintiff

served as a cargo specialist, in a position known as a "stevedore."  R. at 77.  Plaintiff served in

five combat deployments from 2003 through 2008.  Plaintiff reported being deployed on four

tours to Iraq and one tour to Afghanistan in 2005, resulting in at least two instances of head

injury.  R. at 412, 421, 496.  In May or June of 2003, while on deployment in Iraq, Plaintiff was

in a Humvee that flipped over, resulting in a self-reported loss of consciousness, but Plaintiff did

not require treatment and/or evaluation by either a combat lifesaver or a hospital.  R. at 496.  The

second instance occurred in or about February 2006, while Plaintiff was stationed in

---

[6] According to the ALJ, "the purpose of this supplemental hearing is basically to take testimony from Ms. [Santagati] and to clarify the issues raised by her letter, as well as taking supplemental testimony from Mr. Edwards as necessarily [sic]." R. at 39.

[7] The Hearing Transcript provides this person's name as Jacqueline "Hardy," R. at 37, 39, however, the Court finds that the correct spelling of her last name is "Hartley," R. at 218.

[8] The Court notes that the Hearing Transcript provides the Citizens Disability, LLC Vocational Witness' name as Paula "Gotti," R. at 38-39, while the ALJ's decision and Plaintiff's Memorandum of Law refers to her as Paula "Santagati," R. at 13, ECF No. 17 at 19, and Commissioner's Memorandum refers to her as Paula "Santagatio," ECF No. 21 at 2.  Based on the inclusion of both a document authored and signed by Paula Santagati and her curriculum vitae, R. at 365-67, the Court finds that the ALJ and Plaintiff's version of her name is correct, and will refer to her as Paula Santagati ("Ms. Santagati").

Afghanistan.  Plaintiff was again a passenger in a Humvee when a roadside IED exploded, after which Plaintiff reportedly lost consciousness, felt dazed for about a week, and was discharged after a few hours of being seen in the hospital at Camp Anaconda.  R. at 496.  The medical records also include Plaintiff's report of falling of a crane in 2004, but provide no further details. R. at 453, 587.  Plaintiff eventually returned to the United States and underwent lumbar surgery (L5-S1 hemilaminectomy) in 2004 to treat his chronic lower back pain, R. at 457, 468, after which Plaintiff was given a "permanent profile, a P3" and placed on "light duty" with "no physical training and no lifting," a status which remained in place for the duration of his career until his retirement and Honorable Discharge in January 2011 as an E7.  R. at 86-87, 490. Plaintiff underwent cervical spine stabilization surgery on December 13, 2012.  R. at 574. Plaintiff testified that he struggles with chronic neck and back pain[9], nerve pain, his legs "giving out," memory issues, difficulty concentrating, nightmares, flashbacks, blackouts, and daily migraines, and takes medication for anxiety and depression.  R. at 76-90, 93.  His lapses in memory and blackouts are worsened by loud noises and the presence of other people, including his own children, whose names he sometimes forgets.  R. at 80-82.  Plaintiff attends therapy sessions through the Department of Veteran Affairs ("VA") to deal with his PTSD, depression, and insomnia, and receives additional support and mentorship through the Wounded Warriors program and participation in a Fort Eustis church.  R. at 93.  Plaintiff's wife helps him with ninety to ninety-five percent of his daily care, including driving him to appointments, showering, shaving, dressing, chores, and using the bathroom, etc.  R. at 85-89.  Following his retirement from the Army in January 2011 and until May 2014, Plaintiff worked as a biomedical technician

---

[9] At least one provider documents Plaintiff's self-reporting of chronic neck pain beginning in 2000 and chronic lower back pain since 1997.  R. at 456.

for DaVita Dialysis, performing preventative maintenance and repairs on the medical equipment aboard ships. R. at 79, 90. Plaintiff testified that he stopped working because his memory failures rendered him incapable of appropriately performing his job duties, and because he was missing many days of work because Plaintiff required days to recuperate from the exertion of both the actual work and medical appointments and treatments, and the pain and absences became progressively worse. R. at 79-80, 90-92.

### Department of Veteran Affairs ("VA")  Disability Ratings

Between February 1, 2011 and December 11, 2012, Plaintiff's disability rating was seventy percent (70%). R. at 255. Between December 12, 2012 and March 1, 2013, Plaintiff's disability rating was one hundred percent (100%).[10] R. at 255. Between March 1, 2013 and June 26, 2014, a time period which included the commencement of his alleged disability period on May 3, 2014 and during which time Plaintiff worked as a biomedical technician, Plaintiff received a total disability rating of eighty percent (80%). R. at 255. Subsequently, on June 26, 2014, Plaintiff's disability rating was increased to ninety percent (90%) with an additional individual seventy percent (70%) rating for Plaintiff's PTSD. R. at 255, 410, 416. On or about September 8, 2015, the VA assigned disability ratings of seventy percent (70%) to PTSD, fifty percent (50%) to sleep apnea, forty percent (40%) to DDD of the lumbar spine, twenty percent (20%) to DDD of the cervical spine, forty percent (40%) to right leg radiculopathy, resulting in a total disability rating of one hundred percent (100%) commencing May 21, 2015. R. at 249-56. When explaining the seventy percent (70%) rating for PTSD, the VA indicated that Plaintiff would have difficulty adapting to work, difficulty in establishing and maintaining effective work

---

[10] The Court notes that Plaintiff underwent cervical stabilization surgery on December 13, 2012. R. at 574.

and social relationships, and occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks. R. at 254.

Medical Records – Physical Health

Plaintiff's medical records reveal a copious history of treatment with the Emergency Room, Primary Care Providers, and other related treatment at the VA Medical Center in Hampton, Virginia ("VAMC"), the bulk of which occurred after May 3, 2014, Plaintiff's alleged onset disability date.[11] On January 2, 2014, Plaintiff presented to the Emergency Room where he reported chronic, throbbing lower back pain (6 out of 10). R. at 564-67 (Exhibit 1F). Plaintiff was discharged with a note excusing him from work until January 6, 2014, prescriptions for pain killers and muscle relaxers, and was instructed to follow up with his primary care provider if symptoms did not improve and to return to the Emergency Room if the symptoms worsened. R. at 559-62. On July 22, 2014, Plaintiff presented to VAMC Primary Care Clinic for treatment with Shubhada Iruvanti ("Dr. Iruvanti") complaining of chronic neck and back pain and depression. Dr. Iruvanti diagnosed Plaintiff with cervical and lumbosacral DDD, carpal tunnel syndrome, trigeminal neuralgia, sleep apnea, and depression. R. at 551-54. That day, x-rays of Plaintiff's cervical and lumbar spine were taken and revealed no acute cervical status change post C3-C7 fusion, but did indicate degenerative changes in his lumbar spine at L2-L3 and L5-S1. R. at 500-02.

---

[11] Prior to that date, Plaintiff's medical records are significant for lower back surgery in 2004, cervical spine surgery in 2012, dozens of steroid injections to alleviate back pain (between 2008 and 2012), physical therapy in 2012-2013 for arthralgia (joint pain), neck pain, and lumbago (lower back pain), sleep apnea, and constant paresthesia in bilateral lower extremities. R. at 435, 438, 456-57.

On October 16, 2014, and at the request of Dr. David Powell ("Dr. Powell"), Plaintiff presented to Kenneth Waller, M.D., Staff Neurologist and Spinal Cord Injury Physician[12] ("Dr. Waller") for a polytrauma consult during which he reported memory difficulty, recounted the two Humvee incidents, and self-reported symptoms such as headaches, vertigo, intermittent vision loss, tinnitus, bilateral leg weakness and numbness/tingling, depression, lack of energy, feelings of guilt/helplessness/worthlessness, poor sleep, poor concentration, suicidal ideation and abnormal psychomotor activity. R. at 495-509.  Dr. Waller's impressions were that Plaintiff suffered from migraine headaches, healed concussions/traumatic brain injuries, obstructive sleep apnea, PTSD, and urged Plaintiff to quit smoking. R. at 508-09.

On November 17, 2014, Plaintiff returned to the VAMC Primary Care Clinic pursuant to a walk-in referral from the Emergency Room, complaining of chronic lower back pain (8 out of 10), but he was able to ambulate without assistance. R. at 478-84.  Dr. Iruvanti directed Plaintiff to have an MRI of his lumbar spine performed, provided Plaintiff with a prescription for increased dosage of meloxicam (a NSAID - nonsteroidal anti-inflammatory drug), as well as a muscle relaxer to help with muscle spasms, and counseled Plaintiff on the possible sedative results due to interaction with Plaintiff's other four prescriptions for antidepressant/mood stabilizer medications.  Dr. Iruvanti also offered Plaintiff a toradol injection for the back pain, which Plaintiff declined. R. at 478.  Pursuant to Dr. Iruvanti's directive, Plaintiff submitted to an MRI of his lumbar spine on December 11, 2015 which revealed broad-based disc protrusion and moderate to severe foraminal narrowing. R. at 468, 471.

---

[12] R. at 509.

8

On March 6, 2015, Plaintiff visited Dr. Mikiso Mizuki, Jr., a VAMC physiatrist ("Dr. Mizuki") for a physical medicine rehab consultation[13], at which time Plaintiff reported chronic neck and back pain, as well as constant paresthesia in bilateral lower extremities, aggravated by prolonged sitting, standing, and ambulation, resulting in tripping and dragging of his left foot. Dr. Mizuki noted that Plaintiff exhibited a "mildly depressed" and "more frustrated" affect and lumbar spine tenderness. R. at 464-68. Following his evaluation of Plaintiff, Dr. Mizuki documented the following impressions: With regards to Plaintiff's cervical pain, Dr. Mizuki found "[n]o evidence of radiculopathy prior to his 2012 cervical surgery" and indicated that Plaintiff was a candidate for "ongoing conservative treatment of his pain." R. at 467. With respect to Plaintiff's chronic lower back pain ("CLBP"), Dr. Mizuki found no evidence of lumbar radiculopathy, but recommended against invasive procedures, in light of the failure of at least twelve epidural steroid injections ("ESI") (administered between 2008 and 2012) to provide any pain relief. R. at 465, 467. Dr. Mizuki noted that Plaintiff was positive for tobacco dependence, sleep disturbance, and dysthymia.[14] R. at 467. Dr. Mizuki also prescribed Plaintiff multiple pain relief medications, including Tramadol and Vicodin, and recommended yoga three to five times a week as well as a home exercise program focusing on developing core strength. R. at 467.

On June 30, 2015, Plaintiff returned to Dr. Iruvanti complaining of worsening back pain that radiated to his lower extremities and to report that the current pain medication regime was not working. R. at 660-70 (Exhibit 4F). At that time, Plaintiff and his wife communicated their

---

[13] Dr. Mizuki had previously evaluated Plaintiff in December 2012 prior to his 2012 cervical spine stabilization surgery. R. at 457.
[14] The SSA defines "dysthymia" as persistent depressive disorder. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1§ 12.04b.

disagreement with Dr. Mizuki's plan of care, and Dr. Iruvanti referred Plaintiff to a non-VA neurosurgical consult with Hampton Roads Neurosurgical and Spine Specialists. R. at 664. Pursuant to that referral, Plaintiff presented to Nurse Practitioner Cindy Kirkland ("NP Kirkland") and Dr. Jackson Salvant, Jr. ("Dr. Salvant") on August 27, 2015. R. at 636-38 (Exhibit 3F). NP Kirkland and Dr. Salvant found that Plaintiff's MRI was abnormal and discussed alternative treatment options to include surgery, but found that at least a trial period of lumbar ESI was "indicated as part of conservative care for his condition." R. at 638. Plaintiff was also provided a one-time prescription for Percocet to be taken "as needed" based on NP Kirkland's observation that Plaintiff was "extremely uncomfortable today." R. at 638.

<u>Medical Records – Mental Health</u>

Plaintiff's medical records are also significant for mental health treatment through VAMC, the majority of which occurred subsequent to May 3, 2014.[15]  On June 12, 2014, Plaintiff presented to his case manager and social worker, Noel Craig ("Mr. Craig"), where he exhibited a "depress [sic] mood" and requested therapy for PTSD. R. at 558. During the visit, Plaintiff indicated that he was struggling with memory issues, and was short-tempered and angry and became tearful when recounting his combat experiences. R. at 558.

Plaintiff was referred to Dr. Courtney Podesta, VAMC Staff Psychologist ("Dr. Podesta") for "depression." R. at 539. On or about August 7, 2014, Plaintiff presented to Dr. Podesta's office for an intake assessment at which time Plaintiff expressed his chief complaints with

---

[15] It appears that beginning in September 2012, Plaintiff presented to his Primary Care Provider and other VAMC providers with symptoms indicating PTSD, insomnia, nightmares, suicidal ideations, and MDD, in addition to seeking treatment for his chronic back and neck pain. R. at 457. The records indicate that Dr. Iruvanti referred Plaintiff to a Case Worker for a mental health consultation and to determine if Plaintiff was an appropriate candidate for PTSD clinical services, but after initial consultation Plaintiff no-showed or canceled follow-up appointments and did not pursue further mental health or PTSD clinical services at that time (September-December 2012). R. at 441-54.

"memory loss" as his main concern and sleep difficulty, anxiety, and depression as secondary concerns. R. at 539.  During the assessment, Plaintiff shared that the onset of his mental health symptoms occurred in 2010 after returning from a deployment, and included suicidal ideations on at least two occasions, difficulty sleeping, memory lapses/forgetfulness, depression, low mood, and the presence of auditory hallucinations manifesting as hearing someone speaking to him while he was in the bathroom. R. at 539-45. Dr. Podesta diagnosed Plaintiff with PTSD and recurrent Major Depressive Disorder ("MDD"), unspecified.  In addition to developing a treatment plan which included a referral to PCT (VAMC's outpatient PTSD clinic)[16] for mental health assessment/treatment and providing Plaintiff with crisis prevention numbers, Dr. Podesta referred Plaintiff to a Neuropsychologist due to Plaintiff's self-reported ongoing memory impairment. R. at 544.

On or about September 4, 2014, pursuant to Dr. Podesta's referral, Plaintiff saw Margaret R. Johnson, LCSW ("Ms. Johnson") for a mental health consultation/evaluation, R. at 527-31, at which time Plaintiff's chief complaint was memorialized as "I need to sleep," R. at 527. Plaintiff relayed specific military related traumatic stressors including dead Iraqi children. R. at 527. Ms. Johnson's diagnosis impressions included chronic PTSD and moderate, recurrent MDD. R. at 530. Ms. Johnson's initial treatment plan included recommended enrollment in the PCT clinic, continued therapy with Ms. Johnson, and making a medication management appointment. R. at 530. Between September and October 2014, Plaintiff participated in three PTSD therapy sessions with Ms. Johnson, R. at 492-93, 511-14 (September 11, 2014), and in October 2014, Ms. Johnson reported that Plaintiff was "making progress towards his goals," R.

[16] "PCT evaluates and offers treatment to veterans who were exposed to traumatic event(s) while on active duty. Traumas that occurred before or after military service are not eligible for the PCT Clinic." R. at 410.

11

at 493 (October 23, 2014), 512 (October 8, 2014). Plaintiff did not attend any group therapy sessions in November 2014. R. at 484. It appears that Plaintiff attended his next therapy session on May 8, 2015. R. at 612-13. Plaintiff attended three out of four scheduled therapy sessions in August with Dr. Joanne Shovlin Saal, Staff Psychologist ("Dr. Shovlin"). R. at 658-59 (August 4, 2015), 656-57 (August 11, 2015), 655-56 (August 25, 2015). Dr. Shovlin indicated Plaintiff was "making progress towards goals." R. at 657.

On or about September 9, 2014, pursuant to the referral from Dr. Podesta, Plaintiff presented to Dr. Powell, a Rehabilitation Neuropsychologist for the purpose of undergoing a Neuropsychological Evaluation. R. at 519-26. Dr. Powell diagnosed Plaintiff with a personal history of traumatic brain injury, insomnia with sleep apnea (unspecified), chronic headache disorder, and post-traumatic stress disorder and recommended that Plaintiff maintain regular follow-up appointments with Ms. Johnson,  prompt referral for medication evaluation given severity of presenting symptoms and past medial history related to pain, referral for a Polytrauma Consult to further screen his concussive history and obtain further clinical guidance regarding his chronic headaches, but Dr. Powell did not recommend follow-up or repeated neuropsychological evaluations based on current results unless subsequent treatment efforts proved ineffective in mitigating attentional weaknesses and improving daily function. R. at 526.

On September 11, 2014, Plaintiff presented to the Emergency Room for a psychological medication evaluation with Psychiatric Nurse Practitioner Catherine Stuart, ("NP Stuart"), R. at 515-18., pursuant to Dr. Powell's directive, R. at 526. NP Stuart found Plaintiff to be "solidly depressed" and in "need [of] SSRI[17] on board . . . to stop the night terrors." R. at 516-17. Plaintiff returned to NP Stuart on October 8, 2014 while on his way to a group therapy session to

---

[17] selective serotonin reuptake inhibitor

advise NP Stuart of his improvement in energy and reduction in tearfulness and nightmares. R. at 510.

On October 28, 2014, Plaintiff Dr. Hasan Memon, Resident Psychiatrist ("Dr. Memon") and Barin Vyas, Supervising Staff Psychiatrist ("Dr. Vyas") assumed psychiatric care of Plaintiff through the PCT outpatient clinic. R. at 486-92. Dr. Memon reaffirmed Plaintiff's previous diagnoses of PTSD and recurrent MDD, unspecified, R. at 490, and quoted Plaintiff's chief complaint as being "I lose track of things," R. at 488. Pursuant to the providers' stated goal of stabilizing Plaintiff's "behavioral, cognitive, emotional and/or physical symptoms while increasing the ability to function on a daily basis," the PCT clinic providers effectuated a treatment plan which included switching medication for management of PTSD and MDD, prescribing additional medication for insomnia, commencing of lidocaine gel for management of back pain, ordering basic labs for evaluation of Plaintiff's mood, and began Plaintiff on a smoking cessation plan to include nicotine patches and gum replacement. R. at 490.

On January 27, 2015, Plaintiff returned to Dr. Memon for a follow-up visit for "medication management and supportive psychotherapy." R. at 471. Plaintiff reported severe pain in his back that was "so bad he doesn't know whether to live or not sometimes." R. at 471. Plaintiff's wife also informed Dr. Memon that Plaintiff continued to have "PTSD related symptoms including intrusive thoughts and nightmares" and also reported that Plaintiff's "irritability remained high." R. at 471.

<u>State Agency Medical Opinions</u>

Two state agency physician expert medical consultants, Dr. Joseph Familant, M.D. ("Dr. Familant") and Dr. Bert Spetzler, M.D. ("Dr. Spetzler") reviewed evidence in May and June

13

2015, respectively, and offered opinions regarding Plaintiff's physical functional ability.  R. at 112-13, 123-24.  Both Dr. Familant and Dr. Spetzler opined that Plaintiff could perform light work (including lifting/carrying twenty pounds frequently and ten pounds occasionally, and sit and stand or walk for at least six hours in a workday), but was limited to occasional stooping, kneeling, crouching, or crawling and no climbing ladders, ropes, and scaffolding.  R. at 112-13, 123-24.  With respect to Plaintiff's psychological functional ability, two state agency expert psychiatric/psychological consultants, Dr. Hillery Lake, M.D. ("Dr. Lake") and Dr. Jo McClain, PsyD ("Dr. McClain") reviewed the evidence in May and June 2015, respectively.  R. at 112-13, 125-26.  Both Dr. Lake and Dr. McClain agreed that Plaintiff could perform at least simple, routine tasks and interact in a non-demanding social environment despite some limitations in concentration and irritability.  R. at 113, 126.

### Vocational Expert Testimony

As previously noted, the ALJ held two hearings in this matter.  At the first, on October 28, 2015, Mr. Edwards appeared as an impartial vocational expert witness, and was presented with three hypotheticals from the ALJ.  R. at 94-102.  In the first hypothetical, the ALJ asked Mr. Edwards whether, assuming a hypothetical individual with the same age, education, and work experience of Plaintiff, who could perform light work involving no climbing of ladders, ropes, or scaffolds, occasionally stooping, kneeling crouching, and crawling, simple, routine, repetitive tasks due to limitations in concentration, persistence, and pace, and had the ability to occasionally interact with the public, co-workers, and supervisors, employment opportunities were available to such an individual.  R. at 98.  Mr. Edwards responded affirmatively and provided examples of light unskilled jobs including that of a sorter, an office helper, or a small

products assembler. R. at 98-99. For the second hypothetical, the ALJ asked Mr. Edwards to advise whether any jobs were available if the same limitations applied, but with the additional limitations that "the individual can only remain off task, frequently, in a typical day, due to mental symptom flare ups," to which Mr. Edwards responded that there were none, citing the need to maintain at least eighty-five percent (85%) productivity with no more than thirty total minutes of "off task activity." R. at 99 ("No, your honor."). For the third hypothetical, the ALJ asked Mr. Edwards to assume the same limitations as in the first hypothetical (light work involving no climbing of ladders, ropes, or scaffolds, occasionally stooping, kneeling crouching, and crawling, simple, routine, repetitive tasks due to limitations in concentration, persistence, and pace, and had the ability to occasionally interact with the public, co-workers, and supervisors), but with the additional limitation of only occasional grasping and fingering. R. at 100-02. Mr. Edwards testified that there were several light, unskilled jobs available including as an information clerk, as an unarmed security guard (unskilled due to the lack of contact with people), and as an inspector. R. at 101-02. Mr. Edwards also testified that like the second hypothetical, if an individual needed to be off task for more than thirty minutes, then the jobs stated in response to the third hypothetical would be similarly unavailable. R. at 102.

At the supplemental hearing on March 21, 2016, Plaintiff presented the testimony of Ms. Santagati, who opined that based on her experience, the limitation of only occasional interaction with the public, co-workers, and supervisors would preclude Plaintiff's performance of **all** work given that in "most if not all companies" and "even the most entry level jobs have a probationary period" for new employees that requires more than occasional social interaction during which they work closely with co-workers and supervisors to receive training and guidance. R. at 44-48.

15

Ms. Santagati was also asked whether the descriptions of the six jobs suggested by Mr. Edwards' previous testimony, (including a sorter, an office helper, a small products assembler, an information clerk, an unarmed security guard, and an inspector) had undergone recent changes or updates. R. at 44-46. Ms. Santagati testified that for those stated jobs, the last update was to unarmed security guard, which was updated in 1988, whereas the other position descriptions had been last updated in 1977 (information clerk) and 1981 (assembler, office helper, sorter). R. at 45. Ms. Santagati stated that the failure to update these positions meant that practically, the job duties had expanded beyond the outdated Dictionary of Occupational Titles ("DOT") descriptions because companies needed even unskilled or low skilled workers to do more than the discrete tasks outlined by the DOT, and that with respect to assembler and sorter positions, many of these human positions had been replaced by automated machinations. R. at 46-48.

Mr. Edwards was asked to address Ms. Santagati's testimony regarding the probationary periods, to which Mr. Edwards responded that for simple jobs such as sorter, inspector, small product assembler and office helper, the simplistic, unskilled nature of the position necessarily meant that the probationary or training period would be relatively short and require minimal communication. R. at 50-54, 58-61, 68. Additionally, Mr. Edwards reduced the number of available jobs to account for jobs like a sorter which require slightly greater communication than the minimal communication requirement under the DOT. R. at 52.

### III. THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

A sequential evaluation of a claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). The ALJ conducts a five-step sequential analysis for

16

the Commissioner, and it is this process that the Court examines on judicial review to determine whether the correct legal standards were applied and whether the resulting final decision of the Commissioner is supported by substantial evidence in the record. *Mastro*, 270 F.3d at 177. The ALJ must determine if

> (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.

*Strong v. Astrue*, No. 8:10-cv-357-CMC-JDA, 2011 WL 2938084, at *3 (D.S.C. June 27, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (noting that substantial gainful activity is "work activity performed for pay or profit."); *Underwood v. Ribicoff*, 298 F.2d 850, 851 (4th Cir. 1962) (noting that there are four elements of proof to make a finding of whether a claimant is able to engage in substantial gainful activity)). "An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability.   Affirmative answers to questions three or five establish disability." *Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014) (citing 20 C.F.R. § 404.1520).

Under this five-step sequential analysis, the ALJ made the following findings of fact and conclusions of law:   First, the ALJ determined that Plaintiff had not engaged in substantial gainful activity ("SGA") since May 3, 2014, the alleged onset of disability date. R. at 15.

Second, the ALJ found that Plaintiff has the following severe impairments: Degenerative disc disease (DDD) of the spine; right leg radiculopathy; sleep apnea; headaches; PTSD;

17

depression; and anxiety. R. at 16. The ALJ concluded these aforementioned "severe" impairments and their symptoms "limit [Plaintiff's] ability to perform basic work activities significantly by restricting his capacity to lift, carry, interact with others in the workplace appropriately, and sustain concentration for the completion of complex or detailed tasks. R. at 16. The ALJ determined that other alleged impairments, including tendon inflammation, scars, and second degree burns, were not severe because those three disorders "responded to treatment and there was "no evidence of the impairments, (individually or in combination), causing significant limitations in [Plaintiff's] ability to perform basic work activities that lasted, or were expected to last," for a continuous period of least [twelve] months." R. at 16. Additionally, the ALJ gave significant weight to the fact that for these three alleged impairments (tendon inflammation, scars, and second degree burns), the VA assigned a disability rating of zero percent (0%). R. at 17.

As to all other alleged impairments—traumatic brain injury/concussions, carpal tunnel syndrome, and visual impairment— the ALJ found these impairments do not significantly limit Plaintiff's ability to perform work, were not supported by the objective medical records, and the claimed symptomology and limiting affects thereof were otherwise attributable to other impairments deemed severe. R. at 17. The ALJ employed an extensive analysis before rejecting Plaintiff's other alleged impairments as not severe. The ALJ relied significantly on Dr. Powell's neuropsychological evaluation to determine that certain impairments were not severe because the limiting effects were attributable to those impairments which the ALJ did find to be severe. For example, regarding the alleged traumatic brain injury/concussions, the ALJ noted that Dr. Powell found that "while the referral for the evaluation was due to [Plaintiff's] complaints related to

poor memory skills, it became immediately obvious that [Plaintiff's] acute pain due to headaches clouded any and all attempts to more reasonably clarify his optimal cognitive functioning." R. at 17. Additionally, the ALJ noted that Dr. Powell found that "the combination of behavioral observations and testing suggested that [Plaintiff] was suffering from significant and untreated of symptoms of PTSD and insomnia," rather than traumatic brain injury/concussions. R. at 17 (citing R. at 424-25).

At the third step, the ALJ found that Plaintiff did not have an impairment or combination of physical and/or mental impairments that met or medically equaled on of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 17. Specifically, the ALJ found that the record did not establish a spine disorder or evidence of nerve root compression, nor was there evidence of spinal stenosis resulting in pseudoclaudication and an inability to ambulate effectively as defined in 1.00B2b and as required by Listing 1.04. To the contrary, a March 6, 2015 physical examination evidenced 5/5 motor strength, intact sensation, and negative straight leg raising bilaterally. R. at 17 (citing R. at 608-10). With regards to Plaintiff's sleep apnea, the ALJ concluded that although Plaintiff utilizes a CPAP machine and has received other treatment for his sleep apnea, the treatment records to not indicate a sleep-relating breathing disorder "causing mean pulmonary artery pressure greater than 40 mm Hg, or arterial hypoxemia as required by Listing 3.09 and Listing 3.10." R. at 18. The ALJ found that no evidence that Plaintiff's sleep apnea fulfilled the requirements of Listing 12.02, as required by Listing 3.10. R. at 18. While the ALJ recognized that Plaintiff suffered from headaches, he found no evidence of symptoms or complications of the headaches that fulfilled the requirements of any of the

19

impairments provided in Section 11.01 (neurological impairments), or under any other relevant medical listing. R. at 18.

The ALJ then considered Plaintiff's mental impairments, singly and in combination, under Listings 12.04 and 12.06. R. at 18. The ALJ found that regarding "paragraph B" of the criteria of the mental disorder listings, Plaintiff had no marked limitations and no repeated episodes of decompensation. R. at 19. The ALJ noted that Plaintiff's daily living functions— cleaning, cooking, bathing, driving, dressing—were only mildly limited. R. at 18.

As for social function, the ALJ found that Plaintiff had only moderate limitations characterized by nightmares, flashbacks, and difficulty being around children or to function in a stressful situation. R. at 18. The ALJ noted some evidence of Plaintiff's difficulty functioning in stressful situations or when confronted with things that trigger his flashback episodes but, at the same time, observed that Plaintiff's wife helps him a great deal, nothing in the record indicated a complete inability to interact with children, and Plaintiff "demonstrated the ability to participate adequately in group therapy, and has interacted with multiple medical providers appropriately." R. at 18 (citing R. at 373-604 (Exhibit 1F), 605-35 (Exhibit 2F), 639=71 (Exhibit 4F), 672-78 (Exhibit 5F)).

As for concentration, persistence, or pace, the ALJ found that Plaintiff had a moderate limitations characterized by problems focusing, completing tasks, handling stress, and changes in routine. R. at 18. The ALJ further noted that Plaintiff had the ability to perform simple tasks (albeit slowly, but with no errors) and his medical records showed no significant deficits in his memory, thought process, or cognition that could not be linked to some other cause besides a mental impairment. R. at 19 (finding that "the mental impairments combine with physical pain

20

to interfere with his ability to understand, remember, and carry out complex or detailed tasks").

Lastly, the ALJ found Plaintiff had no episodes of decompensation for an extended duration, or a

of "a residual disease process of such severity that even a minimal increase in mental demands

would be expected to result in decompensation," R. at 19, and there was no evidence of an

inability to function in the absence of a highly supportive living arrangement or an indication for

a continued need for such an arrangement, R. at 20. In fact, the record established that Plaintiff

lived with his family and provided multiple examples of instances when Plaintiff would leave his

home for medical appointments, to attend church, and therapy sessions. R. at 20. Therefore, the

ALJ found that Plaintiff's mental impairments did not satisfy the "paragraph C" criteria in the

Listing for mental disorders. R. at 20. In arriving at this conclusion, the ALJ gave only "slight

weight" to the VA's disability rating determination that Plaintiff was one hundred percent

disabled, explaining that "the individually assigned disability percentages do not indicate that

any one impairment is of such severity that it would prevent [Plaintiff] from performing any

work activities on a sustained and continuous basis," and noting that the VA disability

determination system uses a "body part rating formula" and does not address the medical

vocational listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, which govern the ALJ's

determination of disability. R. at 20.

Fourth, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to

perform light work as defined in 20 C.F.R. § 404.1567(b), provided the work only involved no

climbing of rope, ladders, or scaffolding; only occasional stair and ramp climbing; occasional

stooping, kneeling, crouching, and crawling; and only simple, routine, and repetitive tasks, "due

to limitations in concentration, persistence, [or] pace, and "no more than occasional contact with the public, co-workers, and supervisors." R. at 20.

Although the ALJ found that the evidence established the existence of medically determinable impairments (including "back pain, leg pain, sleep disturbance, headaches, nightmares and flashbacks of past trauma, depression, and generalized anxiety") could reasonably be expected to result in the types of reported symptoms, the ALJ determined that the record did not support the degree of limitation Plaintiff claims. R. at 21.

The ALJ did a credibility analysis, noting that although the evidence supported Plaintiff's exertional limitations in lifting, carrying, and performing postural activities due to physical limitations, based on the examinations, conservative nature of Plaintiff's treatment, and the information contained in the provider progress notes, Plaintiff's claims of disabling pain were not fully supported. R. at 27. Additionally, Plaintiff's documented improvement in mental impairments in response to both mental health treatment and the conservative treatment of Plaintiff's physical impairments, do not support a finding of disability or an inability to perform any work. R. at 27. Specifically, the ALJ noted that when Plaintiff was referred to Dr. Salvant and NP Kirkland (of Hampton Roads Neurosurgical and Spine Specialists), Dr. Salvant recommended a trial ESI before surgical or more intensive options could be considered, and Plaintiff received the ESI, tolerated it well, and never followed up with Dr. Salvant or any other provider to report the ESI's failure to provide relief. R. at 24 (citing R. at 682-83 (Exhibit 6F)).

The ALJ determined that Plaintiff was unable to perform his relevant past work as a cargo specialist with the United States Army or as an electronic equipment repair technician, as both positions were skilled, medium work as performed in the national economy, and therefore

were beyond his RFC, which precludes the performance of "skilled" work and work activities that require a "medium" exertional level. R. at 28 (citing 20 C.F.R. § 404.1565). Regardless, the ALJ found that other jobs existed in significant numbers in the national economy that Plaintiff could perform, and thus, he was not under disability during the relevant time period. R. at 28. The ALJ also noted that as of the alleged disability date, Plaintiff was considered a "younger individual," between the ages of 18 and 44 as defined by 20 C.F.R. § 404.1563(c). R. at 28. Plaintiff also has a high school education and is able to communicate in English. R. at 28 (citing R. at 266-78 (Exhibit 1E); 20 C.F.R. § 404.1564). Lastly, the ALJ found that considering his age, education, work experience, and RFC there are jobs such as a sorter, an office helper, and a small products assembler that exist in significant numbers in the national economy that Plaintiff could perform. R. at 29 (citing 20 C.FR. §§ 404.1569, 404.1569(a)). The ALJ also denied Plaintiff's objections to the October 28, 2015 testimony of Mr. Edwards, (which challenged both the content of the testimony and Mr. Edwards' qualifications to provide such testimony at all), finding that Plaintiff's objections were "specious" for several reasons. R. at 29. First, the record includes Mr. Edwards' resume as well as his testimony that he has served as an impartial VE for over a decade, and has spent considerable time in the vocational placement field, and a review of both establishes that Mr. Edwards was a qualified and competent expert witness. R. at 30. Second, with regards to the substance of Mr. Edwards' testimony, the ALJ found that at the supplemental hearing, Mr. Edwards provided a responsive and persuasive explanation for his October 28, 2015 testimony, which Plaintiff's representative could have, but did not question or otherwise raise objections. R. at 30. To the extent that Plaintiff offered the testimony of Ms. Santagati to challenge that of Mr. Edwards, the ALJ rejected Ms. Santagati's

opinion as not credible, noting that Ms. Santagati "is an employ [sic] of the claimant's representative and is employed specifically for the purpose of offering an alternative opinion" on Plaintiff's ability to adjust to other means of employment. R. at 31. The ALJ found that her opinion that "someone who is capable of socially interacting with others for up to 2 hours and 38 minutes in an 8 hour work shift cannot perform any work in the national economy simply defies common sense." R. at 31 & n.2 (finding that pursuant to the DOT definition of "occasional" as one third of the time, for the determination that 2 hours and 38 minutes, when rounded down to the whole minute was 1/3 of 8 hours).

Therefore, the ALJ determined that Plaintiff was not under a disability from May 3, 2014, through May 17, 2016, the date of the ALJ's decision. R. at 31.

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). If "conflicting evidence allows reasonable minds to differ as to whether a claimant is

24

disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

### A. The ALJ erred by failing to properly analyze Plaintiff's one hundred percent disability rating from the VA.

In the first claim of error, Plaintiff argues that the ALJ ran afoul of the Fourth Circuit's holding in *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337 (4th Cir. 2012) requiring the ALJ to give substantial weight to a VA disability rating unless the ALJ clearly demonstrates that less weight is appropriate. ECF No. 17 at 4-10 (quoting *Bird*, 699 F.3d at 343 ("Thus, we hold that, in making a disability determination, the SSA must give substantial weight to a VA disability rating. However, because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate.")). Here, the ALJ specifically stated that he gave "slight weight" to the VA disability determination for essentially two reasons. R. at 27, 31. First, the ALJ found that the formulas utilized by the VA in arriving at such disability ratings are different from those provided in the Social Security regulations, thus a one hundred percent disability rating from the VA does not automatically translate into the inability to perform any work (one hundred percent disability finding) under the SSA regulations. R. at 27, 31.     Second, the ALJ found that the medical evidence supported a

documented improvement in Plaintiff's physical and mental impairments with conservative treatment and ongoing therapy, which do not support a finding of total disability. R. at 27 (citing "Exhibits 1F, 4F, and 6F"). Neither of these reasons complies with the Fourth Circuit's directive in *Bird*.

Regarding the first justification, the ALJ explained that because the VA is concerned with compensating military personnel for specific injuries received in the course of their service, its task is different from that of the SSA, which is to determine whether an individual possesses any functional capacity to work. R. at 27. This observation, however, is not a *reason* for giving less weight to the VA determination, rather it merely points out the differences between the how the VA determines disability, and how the Social Security Administration does so. The Fourth Circuit in *Bird* specifically acknowledged that the two agencies use different standards in determining disability, and nonetheless required the Commissioner to provide a basis for deviating from that determination anyway: "because the SSA employs its own standards for evaluating a claimant's alleged disability . . . an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate." 699 F.3d at 343. Here, the ALJ's first justification did not provide any basis for discounting the VA determination but merely repeated what the Fourth Circuit stated. Consequently, the ALJ's decision not to give substantial weight to the VA's disability determination can only stand if "the record before the ALJ clearly demonstrates that such a deviation is appropriate." *Id.* The Court must therefore look to the ALJ's second justification to determine if substantial evidence in the record supports his conclusion that the VA's disability determination is not entitled to substantial weight.

26

Relying on the record, the ALJ concluded that medical evidence supported a documented improvement in Plaintiff's physical and medical impairments. Almost all of his citations to the record, however, were to the medical evidence as a whole. R. at 17-20. The Court notes that the ALJ's repeated generic citations to Exhibits 1F, 2F, 4F, 5F, 6F and 7F encompass over two hundred and fifty pages of medical records, and the failure to cite to page numbers or dates of treatment does not assist the Court in attempting to substantiate the ALJ's assertions. With the exception of two references to specific entries in the record,[18] the ALJ only cited to the medical records generally, often to multiple sets of records at a time, in support of his conclusion that Plaintiff had "improved' based on treatment. R. at 17-20. This is especially relevant to the lack of specific references in Plaintiff's "improvement" regarding Plaintiff's migraine headaches and PTSD, as discussed in more detail in Parts V.B and C, *infra*. To be sure, Plaintiff does not argue, nor does *Bird* stand for, the proposition that the VA disability determination should be dispositive of the Commissioner's decision, or that the standards used by the VA and the SSA are the same. Here the ALJ's error arises from his failure to, as the Fourth Circuit recently implored, "show his work." *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663 (4th Cir. 2017) ("We do not take a position on the merits of Patterson's application for disability benefits. Instead, the dispute here arises from a problem that has become all too common among administrative decisions challenged in this court—a problem decision makers could avoid by following the admonition they have no doubt heard since their grade-school math classes: *Show your work*. The ALJ did not do so here, and this error rendered his decision unreviewable.")

---

[18] *See* R. at 17("A physical examination from March 2015 showed 5/5 motor strength, intact sensation and negative straight leg raising bilaterally (Exhibit 4F, p.p. 13-14 and Exhibit 2F, p. 6)") and R. at 19 ("[Dr. Powell] indicated that the untreated PTSD and poor sleep could also have a negative influence on the claimant's ability to learn, encode and recall information (Exhibit 1F, p.p. 51-52).").

(emphasis added). To "clearly demonstrate" that the VA disability determination was undeserving of "substantial weight," the ALJ was required to "build an accurate and logical bridge from the evidence to his conclusion." *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); citing SSR 96-8p, 61 Fed. Reg. at 34,478)). The ALJ's repeated citation to over two hundred and fifty pages of medical records as a whole to support the proposition that Plaintiff experienced improvement of his impairments, as purportedly demonstrated in those records, falls far short of the Fourth Circuit's requirement of a clear demonstration. The ALJ was required to do more; especially in light of his finding that Plaintiff's PTSD and migraines amounted to severe impairments.

In sum, the ALJ's decision failed to meet the standard enunciated in *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337 (4th Cir. 2012). Therefore, the Court recommends reversal of the Commissioner's decision on this claim and remand for further proceedings not inconsistent with this conclusion.

## B. The ALJ erred by failing to include the most limiting effects of Plaintiff's headache impairment in Plaintiff's RFC, despite finding that such headaches constituted a "severe" impairment.

In the second claim of error, Plaintiff argues that the ALJ's finding concerning Plaintiff's RFC failed to account for the effect of Plaintiff's headaches, despite finding them to represent a "severe impairment." ECF No. 17 at 10-13. Failure to account for the effect of Plaintiff's headache impairment would violate the federal regulations:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, *we will consider the combined effect of all of your impairments* without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be

28

> considered throughout the disability determination process. If we do not find that
> you have a medically severe combination of impairments, we will determine that
> you are not disabled.

20 C.F.R. § 404.1523 (emphasis added).    Specifically, Plaintiff argues that the ALJ's
determination of Plaintiff's RFC does not meet the requirement of providing detailed findings
that account for *all* of Plaintiff's limitations in concentration, persistence and pace. Simply
limiting Plaintiff to simple, routine, and repetitive tasks does not appropriately account for an
impairment found to be severe, especially where Dr. Powell's neuro-psych evaluation of Plaintiff
found that Plaintiff's headaches contributed to his deficiencies in concentration and cognitive
functioning.

 The Commissioner attempts to substantiate the ALJ's decision by pointing to specific
references in the record, which she then argued supported the ALJ's conclusions; however, the
Commissioner cannot provide post hoc support for the ALJ or articulate the reasons for the
ALJ's findings when he failed to do so himself.  Because of the ALJ's failure to "show his
work," the Court is unclear whether the references provided by the Commissioner were the
references actually relied upon by the ALJ, thus rendering such conclusions incapable of
meaningful review by this Court.  Furthermore, even if the ALJ did actually rely on the
references identified by the Commissioner, closer examination of such references reveals that the
ones identified by the Commissioner in her brief may not provide substantial evidence to support
the ALJ's conclusions regarding Plaintiff's migraines.  For instance, the Commissioner cites to
the record of Plaintiff's last primary care appointment on June 30, 2015 at which time he saw Dr.
Iruvanti and apparently "did not complain of headaches and headaches were not listed as an
'active problem'" and "Dr. Iruvanti did not prescribed [sic] any treatment for headaches."  ECF

29

No. 21 at 23 (citing R. at 660-70).  However, at that *same* June 30, 2015 visit, the Court notes that Dr. Iruvanti apparently refilled Plaintiff's prescription for "Verapamil HCL 180 mg SA tab take one tablet by mouth at bedtime prevention of severe migraine headaches," (R. at 661, 664) which appears to contradict the Commissioner's conclusion that Dr. Iruvanti did not prescribe treatment for headaches.  But of course, it is not the Court's role to speculate what particular parts of the record were relied on by the ALJ in reaching his conclusions.

By acknowledging the effects of Plaintiff's migraines contained in Dr. Powell's neuro-psych evaluation, yet failing to specifically address the effects of Plaintiff's headache impairment on his ability to function, the ALJ left the Court incapable of performing a meaningful review of his findings.  *See* R. at 26 (observing that "Dr. Powell also reported that although [Plaintiff] was originally referred for complaints of memory loss, it became immediately obvious that his acute pain secondary to poorly defined by extreme headaches, clouded any and all attempts to more reasonably clarify his optimal cognitive function").  Mere conclusions that Plaintiff's condition improved, without specific explanation and record citation to how such improvement overcomes the severe impairment of headaches as found by the ALJ, does not provide the Court with a sufficient basis to determine if substantial evidence supports the ALJ's decision.  *See* R. at 27 (finding "the evidence received at the hearing level includes documented improvement in [Plaintiff's] mental impairments with treatment and ongoing conservative treatment for the physical impairments.  The findings from examinations, including normal gait, normal muscle strength (no atrophy), and normal sensation do not support total disability, nor does the evidence from therapy notes confirming improvement in [Plaintiff's]

30

symptoms with treatment") (citing "Exhibits 1F, 4F, and 6F").[19] Therefore, remand is necessary for the ALJ to provide such an explanation. *See Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015) ("But because the ALJ here gave no explanation, a remand is in order.").

**C. The ALJ's determination of Plaintiff's RFC limiting Plaintiff to "simple, routine and repetitive" tasks does not account for Plaintiff's specific limitations in concentration, persistence, and pace.**

Plaintiff contends that the ALJ's RFC finding was legally insufficient because when a claimant has mental impairments, the mental RFC assessment must necessarily include all limits on work-related activities resulting from mental impairments. ECF No. 17 at 13-14 (quoting SSR 85-16). The Court agrees. The ALJ limited Plaintiff to simple, routine, repetitive tasks. R. at 20. The neuro-psych evaluation performed by Dr. Powell (and relied upon heavily by the ALJ) documented problems in Plaintiff's concentration, persistence, and pace due to pain and PTSD, R. at 422-25, yet the ALJ failed to explain how performing simple, routine, repetitive tasks would overcome Plaintiff's deficiency in performing them at an adequate pace. The Court notes that Dr. Powell's evaluation specifically found that Plaintiff's concentration, persistence, and pace suffered on non-cognitively demanding tasks, i.e., simple, routine, repetitive tasks. R. at 422. Because Dr. Powell's report suggests that these are the very type of tasks on which Plaintiff's concentration, persistence, and pace are adversely affected, requiring Plaintiff to do this type of work does not compensate for the concentration, persistence, and pace deficiencies, it exposes them. *Mascio v. Colvin*, 780 F.3d 632, 636–37 (4th Cir. 2015) ("Here, the ALJ has determined what functions he believes Mascio can perform, but his opinion is sorely lacking in the analysis needed for us to review meaningfully those conclusions. In particular, although the

---

[19] Exhibit 1F = R. at 373-604; Exhibit 4F = R. at 639-71; Exhibit 6F = 679-83

ALJ concluded that Mascio can perform certain functions, he said nothing about Mascio's ability to perform them for a full workday.").

Accordingly, remand is required so that the ALJ can explain his findings. *See Wedwick v. Colvin*, No. 2:14CV267, 2015 WL 4744389, at *24 (E.D. Va. Aug. 7, 2015) (remanding because the ALJ did not properly question the VE regarding the claimant's ability to stay on task due to limitations in concentration, persistence, and pace); *Scruggs v. Colvin*, No. 3:14-CV-00466-MOC, 2015 WL 2250890, at *6 (W.D.N.C. May 13, 2015) ("The court finds that the facts here squarely align with *Mascio,* and as such, believes that remand is appropriate so that the ALJ may properly account for plaintiff's limitations in concentration, persistence, or pace."); *Morton-Thompson v. Colvin*, No. 3:14CV179 REP, 2015 WL 5561210, at *7 (E.D. Va. Aug. 19, 2015) *report and recommendation adopted sub nom. Thompson v. Colvin*, No. 3:14CV179, 2015 WL 5561211 (E.D. Va. Sept. 14, 2015) (remanding because "the ALJ failed to discuss Plaintiff's ability to perform those relevant functions for a full workday.").

## D. The ALJ did not err at Step 5 by accepting the testimony of vocational expert Mr. Edwards over that of Ms. Santagati.

Plaintiff argues that the ALJ impermissibly relied upon the testimony of Mr. Edwards and erred by rejecting the testimony of Ms. Santagati, and therefore his decision is not supported by substantial evidence. ECF No. 17 at 18-21. This argument is not persuasive.

The thrust of Ms. Santagati's opinion was that a claimant such as Plaintiff with a limitation of occasional interaction with the public, coworkers and supervisors cannot find work in the national economy because all jobs require more than such occasional interaction. R. at 43-48. She testified that the jobs identified in the DOT as being available for Plaintiff, according to Mr. Edwards, the neutral vocational rehabilitation expert, require more than occasional social

interaction because of training needs, probationary periods, and an employer's need for employees who can perform multiple duties, in addition to their main job title, which will require more than occasional communication and interaction with others. R. at 43-48. Ms. Santagati opined that based on her experience, the DOT descriptions for the jobs identified by Mr. Edwards at the March 28, 2015 hearing were woefully outdated and did not accurately reflect the requirements of positions that actually exist in the national economy. R. at 44-48. Mr. Edwards provided rebuttal testimony, and further explained that for the jobs he identified, the positions involved essentially no communication because the positions are so incredibly simple, that training would be limited to demonstrations performed by the trainer to the trainee. Given that simplicity, the probationary period would be equally devoid of communication because the supervisor could observe whether or not the worker was performing the task to the supervisor's satisfaction. R. at 49-68. Mr. Edwards also provided practical examples of why the duties engendered by the position of unarmed security guard or security monitor in a remote location required very little, if any communication or personal interaction. R. at 53-55.

The ALJ rejected Ms. Santagati's testimony because her contention that "no jobs existed in significant numbers the national economy, which would not require more than occasional social interaction during the training period, is suspect." R. at 31. Mr. Edwards disagreed with Ms. Santagati's proposition, based on both his experience and knowledge of the jobs at issue, and the ALJ accepted his testimony as "based on information accepted by the Administration as credible," and found his testimony "more persuasive and consistent with reality." R. at 31. The ALJ also relied on Ms. Santagati's employment relationship with Plaintiff's representative to find her testimony "not credible" as compared to that of Mr. Edwards. R. at 31.

33

The Court finds that the ALJ's explanation for rejecting Ms. Santagati's testimony was supported by substantial evidence, as the testimony provided by Mr. Edwards at both the initial hearing and the supplemental hearing provided a sufficient basis for the findings regarding the specific jobs available for someone with the Plaintiff's stated RFC. Where the DOT provides a listing of jobs which incorporate specific limitations for occasional social interaction, and a neutral vocational expert testifies that such jobs do exist in the national economy, based, in part, on his personal experience placing individuals in those jobs, then the ALJ does not err in relying on such testimony and rejecting testimony which directly attempts to refute the DOT. However, because the Court has recommended that the matter be remanded to the Commissioner for further explanation of the ALJ's conclusions, this recommended finding does not alter that conclusion.

**E.   Inasmuch as the ALJ's credibility assessment is generally deficient because of the aforementioned errors, the undersigned does not reach a conclusion as to whether the ALJ's failure to specifically address Plaintiff's work history in connection with the ALJ's credibility determination is error.**

The ALJ found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. at 27. Plaintiff argues that this credibility determination is unwarranted in light of the medical evidence, but also because of Plaintiff's lengthy and consistent work history, which the ALJ apparently failed to consider. ECF No. 17 at 21-23. The Commissioner rejects this argument as improperly suggesting that work history affords a claimant enhanced credibility—a proposition not supported by the law—and further contends that "the ALJ was clearly aware of Plaintiff's work history," and that he "fully developed the

34

evidence of Plaintiff's past work during the hearing." ECF No. 21 at 29-30 (citing R. at 97 and 28-31).

The Court does not interpret Plaintiff's argument to be that in determining credibility, Plaintiff's work history carries more weight than other factors, or that Plaintiff's work history entitles him to enhanced credibility. Rather, the Court considers this allegation of error to be that nothing in the decision indicates that the ALJ considered Plaintiff's work history at all as part of his assessment of Plaintiff's credibility, and this is a factor an ALJ needs to consider as part of his credibility determinations in generating Plaintiff's RFC.

While a strong work history alone does not compel a credibility finding, agency policy does require that it at least be considered as part of the RFC assessment. *See* 20 C.F.R. § 404.1529(c)(3) ("Because symptoms sometimes suggest a greater severity of impairments than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. . . . We will consider all of the evidence presented, including information about your prior work history . . ."). Based on the record, it is not altogether clear the extent to which, if at all, the ALJ considered Plaintiff's work history in evaluating his credibility. The Commissioner cited to two places in the record where the ALJ "fully developed the evidence of Plaintiff's past work during the hearing," citing to pages 97 and 28-31. ECF No. 21 at 30. Based on the references cited by the Commissioner, this is a gross overstatement. In the first instance, only page 97, not pages 28-31, is from the hearing. Further, on page 97, the ALJ mentioned Plaintiff's work history only generally in questioning Mr. Edwards: "Commissioner: And Mr. Edwards, now based on the claimant's testimony today, his past work is that of a cargo specialist with the army and basically as a biomedical technician. Do

35

you need any additional information to testify as to these positions?" R. at 97.[20] With respect to the citation to pages 28-31 of the Record, this is from the ALJ's Decision and reflects his analysis at Step 5 of the sequential evaluation. There, without actually describing Plaintiff's work history, the ALJ referenced Plaintiff's "work experience" very generally four times, in remarkably similar language, in the pages cited.[21] But nowhere in in his Decision did the ALJ actually describe Plaintiff's work history or explain what effect, if any, it had on his credibility determination. Consequently, were there no other deficiencies in the ALJ's decision, the Court would have to determine whether this claim of error, standing alone, would warrant remand. However, because the Court recommends that the matter be remanded for the reasons discussed in Parts V.A-C, *supra*, the Court does not need reach this question. However, should this matter be remanded in order for the ALJ to explicitly provide the basis for his assessment of Plaintiff's RFC and his reasoning for discounting the VA's determination of Plaintiff's disability rating, the ALJ would be wise to articulate what role, if any, Plaintiff's work history played in his credibility findings.

---

[20] Although not cited by the Commissioner, the Court notes that the ALJ also asked Plaintiff the following questions about his work history: "[y]ou served in the army, right?"; "[a]nd when did you start there?"; "[a]nd what was your rank on retirement?"; "[t]hat's '97, right?"; "[a]nd what – you were in cargo?" R. at 77.

[21] R. at 28 ("Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform."); R. at 29 ("[T]he Administrative Law Judge asked Mr. Edwards, the vocational, [sic] expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual function capacity."); R. at 29 ("Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual function capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.") ; R. at 31 ("Based on the testimony of Mr. Edwards, the undersigned finds that considering the claimant's age, education, work experience, and residual function capacity, the claimant is capable of making a successful adjustment to other work existing in significant numbers in the national economy.").

## VI. RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** the Commissioner's Motion for Summary Judgment, ECF No. 20, be **DENIED**, Plaintiff's Motion for Summary Judgment, ECF No. 16, be **GRANTED** to the extent it seeks reversal and remand of the Commissioner's decision, and **DENIED** to the extent that it seeks entry of an order directing the award of benefits, and the Commissioner's decision be **VACATED** and **REMANDED.**

## VII. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is forwarded to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a) plus three days permitted by Federal Rule of Civil Procedure Rule 6(d). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the

counsel of record for Plaintiff and the Commissioner.

LAWRENCE R. LEONARD
UNITED STATES MAGISTRATE JUDGE

Newport News, Virginia
January 22, 2018